Sol J. ELLERIN, a stockholder of The General Tire & Rubber Company, suing on behalf of himself and all other stockholders similarly situated, and on behalf and in the right of The General Tire & Rubber Company, Plaintiff-Appellant,

v.

MASSACHUSETTS MUTUAL LIFE IN-SURANCE COMPANY, and The General Tire & Rubber Company, Defendants-Appellees.

No. 210, Docket 25352.

United States Court of Appeals Second Circuit.

Argued March 4, 1959.

Decided Sept. 8, 1959.

260

Morris J. Levy, New York City, for plaintiff-appellant.

Thomas G. Meeker, Gen. Counsel, Joseph B. Levin, Asst. Gen. Counsel, George P. Michaely, Jr., Atty., Washington, D. C., for Securities and Exchange Commission, Amicus Curiae in aid of plaintiff-appellant.

Rowland H. Long, Springfield, Mass. (Edward T. Post and Tanner, Friend, Kinnan & Post, New York City on the brief), for defendant-appellee, Massachusetts Mutual Life Insurance Co.

John F. Dooling, Jr., New York City (George C. Kern, Jr., William J. Kirby, and Sullivan & Cromwell, New York City, on the brief), for defendant-appellee, General Tire & Rubber Co.

Before MEDINA and HINCKS, Circuit Judges, and MATHES, District Judge.*

MEDINA, Circuit Judge.

Plaintiff, Ellerin, a stockholder of The General Tire & Rubber Company, is seeking on behalf of the company under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78p(b), to recover certain profits realized by the defendant, Massachusetts Mutual Life Insurance Company, from its purchases and sales of General Tire common stock within a period of less than six months. El-

* United States District Judge for the Southern District of California, sitting by designation.

lerin appeals from an order of the District Court denying his motion for a summary judgment, granting a similar motion of Massachusetts Mutual and dismissing his complaint. The SEC, as *amicus curiae*, has filed a brief supporting Ellerin's position and appellees argue for affirmance, General Tire seeking to protect its interests in series financing.

This is the first time a court has been asked to find that each series in an issue of preferred stock is a separate "class," and that the owner of more than 10% of the stock of a particular series is an "insider" and liable for shortswing profits under Section 16(b). This contention is supported with considerable resourcefulness by Ellerin and by the SEC who advance a variety of arguments, the general purport of which is that the interpretation they would have us adopt would tend to further the underlying purposes of the statute and curb abuses by "officers, directors and principal security holders." They also claim that the literal wording of Section 16 as well as the overall pattern of the Act and the SEC Rules and Regulations substantiate their view. Massachusetts Mutual in effect tells us that "class" means "class" and that a "series" is not a "class" of stock; and General Tire argues to the same effect. It is clear that the authorization of the issue of stock and the transactions of the parties to this litigation were undertaken in the ordinary course of business and without any thought that Section 16(b) was in any way involved.

It is our view that the wording of the statute is clear on its face and that no amount of liberality in the interpretation of Section 16 would justify us in holding that a separate series of an issue of preferred stock was intended by the Congress to be encompassed by the word "class." We shall review the facts and the principal contentions of Ellerin and the SEC, as well as those of Massachusetts Mutual and General Tire, but we think it proper to say at the outset that the true guide to what is meant by an "insider" must be found in the definition in the statute itself, and that any attempt to substitute a different evaluation based either upon a close examination of the terms and conditions of particular issues, which would fluctuate and require reappraisal according to the facts of each case, or upon far-fetched inferences drawn from rules and regulations of the SEC not *in pari materia* can only result in uncertainty and confusion in an area of the law where the statute contains internal evidence that the Congress intended to establish a certain and self-sufficient test.

The facts have been stipulated. General Tire is authorized to issue in series 150,000 shares of Cumulative Preferred Stock of $100 par value. Two such series have been issued. The first designated $4\frac{1}{4}$% Cumulative Preferred was registered under the Securities Exchange Act on April 5, 1945 and listed on the New York Stock Exchange on April 26, 1945. The second, designated $3\frac{3}{4}$% Cumulative Preferred Stock, was registered under the Act June 4, 1946 and listed on the New York Stock Exchange July 3, 1946. General Tire issued 75,000 of the $4\frac{1}{4}$% preferred and 25,000 of the $3\frac{3}{4}$% preferred.

Between November 1, 1954 and February 28, 1955 Massachusetts Mutual was the owner of 2,500 shares of the $3\frac{3}{4}$% Cumulative Preferred. During those times there were 18,605 shares of the $3\frac{3}{4}$% series and 52,488 of the $4\frac{1}{4}$% Cumulative Preferred left issued, outstanding and registered on the New York Stock Exchange. And it was during this interval that Massachusetts Mutual purchased and sold 7,143 shares of General Tire common stock resulting in a profit of $22,006.90.

Section 16(b) provides:

"For the purpose of preventing the unfair use of information which may have been obtained by *such beneficial owner*, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any pe-

riod of less than six months, * * shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. * * " (Emphasis supplied.)

The term "such beneficial owner" clearly refers to Section 16(a) which provides:

"Every person who is directly or indirectly the beneficial owner of more than 10 per centum *of any class of any equity security* (other than an exempted security) which is registered on a national securities exchange, or who is a director or an officer of the issuer of such security, shall file, at the time of the registration of such security or within ten days after he becomes such beneficial owner, director, or officer, a statement with the exchange (and a duplicate original thereof with the Commission) of the amount of all equity securities of such issuer of which he is the beneficial owner, * * * " (Emphasis supplied.)

Ellerin asserts that Massachusetts Mutual is such "beneficial owner" because it owned over ten per cent of the 3¾% Cumulative Preferred stock outstanding at the time of its dealings in General Tire common. Massachusetts Mutual contends that all the Cumulative Preferred stock must be considered together for the purposes of determining a "class" of stock within the meaning of Section 16(a) and that if Massachusetts Mutual's holdings are compared to the aggregate of the outstanding shares of both the 3¾% Cumulative Preferred and the 4¼% Cumulative Preferred, the requisite ten per cent ownership necessary for treatment as an insider is lacking.

■ Massachusetts Mutual contends, and the court below held, that each of the two series was a separate series within the "class" of Cumulative Preferred stock. Ellerin asserts that each of these two series is a "class" in itself within the meaning of the Act notwithstanding any labels attached thereto by General Tire in its articles of incorporation.

The differences and similarities between the two series of stock were described in great detail by Judge Herlands in his opinion at 167 F.Supp. 71, 76–78, and will be only briefly summarized here. The chief differences upon which Ellerin rests his claim for individual class characterization are in the following respects: (1) annual dividend rates; (2) redemption prices, via sinking fund or otherwise; (3) sinking fund accumulation rates; (4) dates of issuance, registration, listing and commencement of the payment of dividends; and (5) voting rights in the event that rights and preference of one of the series are being adversely affected. Each series may be redeemed separately.

On the other hand the two series are identical with respect to: (1) preference as to dividends; (2) preference upon the distribution of assets; (3) cumulative but nonparticipating rights as to dividends; (4) lack of voting rights but each series vote as a class on corporate amendments adversely affecting the cumulative preferred stockholders and on certain other structural changes; and in the event of a default in the payment of four quarterly dividends, the cumulative preferred holders as a class elect one-third of the Board of Directors; (5) lack of pre-emptive rights; (6) lack of conversion rights; (7) par value.

The question is what the Congress meant by the term "class of any equity security." There is no prior case law on this point, no statutory history to guide us and no legislative definition to which we can refer. But the very absence of congressional direction or guidance suggests that the Congress thought the meaning of the phrase "class of any equity security" was reasonably clear and it was using familiar terms in their ordinary and generally accepted sense according to the common usage of the day in the legal and financial worlds.

■ As we find an abundant showing that at the time of the passage of the Securities Exchange Act of 1934 and continuously thereafter the terms "class" and "series" were familiar terms in common usage, we think we have no alternative other than to follow the common usage and decide, as we do, that a "class" is not a "series" within the meaning of Section 16. Reference to the state laws throughout the nation reveals that the terms "class" and "series" are differentiated, a "series" being considered a part of a "class." Most of the states, in fact, specifically provide for the division of "classes" into series. E. g., Calif.Corp. Code Ann. Section 1100 (West 1954); Del.Code Ann. Title 8, Section 151 (1953); Ill.Rev.Stat. Chapter 32, Section 157.15 (1957); N.J.Stat.Ann. Section 14:8–2 (1939); N.Y.Stock Corp.Law, McKinney's Consol.Laws, c. 59, Section 11; Ohio Rev.Code, Section 1701.06 (1953); Penna.Stat.Ann., Title 15, Section 2852–602 (Purdon 1958); see also the Model Business Corporation Act, Section 15. In many instances, moreover, the permissible limits of series differentiation are spelled out, but in no case would the two series under discussion here fail to qualify as such. Variations in dividend rates, redemption prices and terms, and sinking fund provisions are specifically envisioned as allowable variants. The same understanding of the term also prevailed in 1934, when the Securities Exchange Act was enacted. E. g., California Civil Code, Section 290, as amended by Laws 1933, Chap. 533, Section 3†; Del.Gen.Corp.Law Section 13, 8 Del.C. § 151; Ill.Stat.Ann. Section 32.015 (Jones 1934), Ill.Rev.Stat.1957, c. 32, § 157.15; N.J.Laws 1930, Chapter 123, Section 1, amending Compiled Statutes, 1910, Section 18, N.J.S.A. 14:8–1 to 4; New York Stock Corp. Law, Section 11; Ohio Code Ann. Section 8623–4 (Throckmorton 1930); Pennsylvania Business Corporation Law of 1933, Section 602, 15 P.S. § 2852–602. Leading legal and financial writers similarly recognize the distinction between the terms "class" and "series." See 11 Fletcher, Corporations, pp. 841–42 (1958 Rev. Vol.); Baker and Cary, Cases on Corporations, pp. 984–85 (1958); Guthmann and Dougall, Corporate Financial Policy, pp. 83, 91 (3d Ed.1955); Dewing, Financial Policy of Corporations, p. 162 (5th Ed. 1953); Berle & Warren, Business Organizations (Corporations), pp. 636–37 (1948).

■ It is urged, however, that despite this common understanding of the term, the Congress intended something else for purposes of Section 16. We are reminded that the statute is "broadly remedial" and has been consistently given a liberal interpretation by the Courts. See Smolowe v. Delendo Corporation, 2 Cir., 1943, 136 F.2d 231, 148 A.L.R. 300, certiorari denied 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446; Gratz v. Claughton, 2 Cir., 1951, 187 F.2d 46, certiorari denied 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353; Stella v. Graham-Paige Motors Corp., 2 Cir., 1956, 232 F.2d 299, certiorari denied 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52; Adler v. Klawans, 2 Cir., 1959, 267 F.2d 840. While we fully endorse this judicial disposition to further the congressional purpose of curbing insider abuse, we are not at liberty to extend such curbs beyond the specific limitations the Congress has imposed. We are told by appellant and by the SEC that the literal meaning of the phrase "any class of any equity security" requires us to treat a series as a class because the words "any class of" would otherwise be superfluous. This conclusion is arrived at by assuming that "any equity security" refers to a general category such as cumulative preferred stock and that a subdivision (class) of such a category would be a series. It is much more natural, we think, to read the phrase "any equity security" as referring to the kind or nature of the security. Thus no security is excluded no matter how like debt it is. Indeed, we think no other interpretation possible in view of the broad definition

† Now West's Ann.Corp.Code, §§ 301–305.

of this very phrase in Section 3(a)(11) of the Act.[1]

Perhaps the main thrust of the argument for reversal is based upon the words "which is registered on a national securities exchange" which follow the phrase "any class of any equity security" in Section 16(a). It is argued that the statute does not affect a beneficial owner of more than 10 per centum of any class of any equity security, but only the owner of such a percentage of any class of any equity security "which is registered on a national security exchange." This is supposed to bring into operation Section 12 of the Act relative to "Registration requirements for securities" as a "touchstone" for the application of Section 16. The basis for this is that the registration statement is required to give the name of "each security holder of record holding more than 10 per centum of any class of any equity security of the issuer." Section 13 requires the filing of periodic reports keeping such information current and the SEC in the exercise of its rule making power[2] under Sections 3(b), 12(a) and 23(a) has promulgated Rule 12d1–1(a), 17 C.F.R. Section 240.12d1–1(a) which uses the term in the following context:

"An application filed pursuant to Section 12(b) and (c) of the act for registration of a security on a national securities exchange shall be deemed to apply for registration of the entire *class* of such security. Registration shall become effective, as provided in section 12(d) of the act, (1) as to the shares or amount of such *class* then issued, and (2), without further application for registration, upon issuance as to additional shares or amounts of such *class* then or thereafter authorized." (Emphasis supplied.)

Rule 12d1–1(d), 17 C.F.R. Section 240.-12d1–1(d) then provides:

"If a class of security is issuable in two or more series with different terms, each such series shall be deemed a separate class for the purposes of this section."

Since registration on a national securities exchange is a prerequisite to the application of Section 16(a), it is urged that uniform treatment of the term "class" should be given to both sections. The commonness of their purpose is stressed, Section 12(b) requiring the issuer to disclose large record holders (i e. those holding more than ten per cent of any class of any equity security), Section

1. Section 3(a) (11), 15 U.S.C.A. § 78c(a) (11) provides:

"The term 'equity security' means any stock or similar security; or any security convertible, with or without consideration, into such a security, or carrying any warrant or right to subscribe to or purchase a security; or any such warrant or right; or any other security which the Commission shall deem to be of similar nature and consider necessary or appropriate, by such rules and regulations as it may prescribe in the public interest or for the protection of investors, to treat as an equity security."

2. Section 3(b), 15 U.S.C.A. § 78c(b) provides:

"The Commission and the Board of Governors of the Federal Reserve System, as to matters within their respective jurisdictions, shall have power by rules and regulations to define technical, trade, and accounting terms used in this chapter insofar as such definitions are not inconsistent with the provisions of this chapter."

Section 12(a), 15 U.S.C.A. § 78l(a) provides:

"It shall be unlawful for any member, broker, or dealer to effect any transaction in any security (other than an exempted security) on a national securities exchange unless a registration is effective as to such security for such exchange in accordance with the provisions of this chapter and the rules and regulations thereunder."

Section 23(a), 15 U.S.C.A. § 78w(a) provides:

"The Commission and the Board of Governors of the Federal Reserve System shall each have power to make such rules and regulations as may be necessary for the execution of the functions vested in them by this chapter, any may for such purpose classify issuers, securities, exchanges, and other persons or matters within their respective jurisdictions. * * *"

16 requiring disclosure from the large stockholders and imposing statutory liability on their short-term profits. Each uses a common yardstick for measuring large stockholdings, namely, 10% of a class.

In reply it is pointed out that Rule 12d1–1(d) itself seems to recognize the distinction between "class" and "series" but simply chooses to treat them alike. Moreover, if "class" generally meant series, the special definition in Rule 12d1–1(d) would be superfluous. Further, it is indicated that this Rule is only a procedural detail of registration and not to be confused with the breadth of the statutory command. We are inclined to take Rule 12d1–1(d) at its word when it states it is intended only "for the purposes of this section."

A somewhat similar argument is based on Section 15(d) of the Act which deals with reporting requirements filed pursuant to the Securities Act of 1933 but not with securities registered under the 1934 Act. It provides in pertinent part:

> "For the purposes of this subsection, the term 'class' shall be construed to include all securities of an issuer which are of substantially similar character and the holders of which enjoy substantially similar rights and privileges."

By some process of reasoning that is not clear to us this definition is connected up with Section 16 and used to expand the meaning of "any class of any equity security," so as to embrace all securities "which are of substantially similar character and the holders of which enjoy substantially similar rights." Here again we think it a sufficient answer to say that the definition contained in Section 15(d) is "for the purpose of this subsection."

We are thus compelled to conclude that when the Congress used the term "class" it meant just that and not series. We find no congressional intent to curb or impede series financing. We are not confronted with a situation involving sham characterizations. Although, of course, corporate labels are not necessarily binding on the court, Colby v. Klune, 2 Cir., 1949, 178 F.2d 872, such differences as there are between the two series in question are those commonly found among series of the same class. Differences in dividend rate, redemption prices, sinking fund requirements all commonly vary with economic and market conditions and the financial strength of the corporation. That each series was issued, listed, and registered at different dates is, of course, an almost inseparable consequence of series financing, the whole point of which is to facilitate corporate money raising at different times. The fact that the two series would not be exchangeable for each other, could be redeemed separately, and on rare occasions might have differing voting rights is but again to state the natural incidents of issuing stock in series.

Our holding makes it unnecessary to discuss the other arguments advanced by Massachusetts Mutual.

Affirmed.